IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

EQUIBRAND CORPORATION, §
§
Plaintiff, §
§
v. § 3:07-CV-0536-P
§
REINSMAN EQUESTRIAN PRODUCTS, §
INC. and DALE R. MARTIN, §
§
Defendants. §

## MEMORANDUM OPINION AND ORDER

Now before the Court is Plaintiff Equibrand Corporation's ("Equibrand" or "Plaintiff")

Application for Temporary Restraining Order and Preliminary Injunctive Relief, filed March 26,

2007.[1] After reviewing the briefing and applicable law, the Court GRANTS Plaintiff's Motion.[2]

## I. Background and Procedural History

Equibrand is a provider of various equestrian products, including saddles, bridles,

headstalls, reins, curb straps, breast collars, stirrups, ropes, boots, cinches, spurs, blankets, and

---

[1] Pursuant to the Court's Order of March 26, 2007, Defendants filed a Response on April 2, 2007, and Plaintiff filed a Reply on April 6, 2007.

[2] On April 9, 2007, Defendants filed a Motion for Leave to File Defendants' Joint Surreply Brief. This Court has stated:

> The purpose for having a motion, response, and reply is to give the movant the final opportunity to be heard, and to rebut the nonmovants' response, thereby persuading the court that the movant is entitled to the relief requested by the motion. A sur-reply is appropriate by the non-movant only when the movant raises new legal theories or attempts to present new evidence at the reply stage.

*Murray v. TXU Corp.*, No. 3:03-CV-0888-P, 2005 U.S. Dist. LEXIS 10298, at *13 (N.D. Tex. May 27, 2005) (internal citations and quotation marks omitted). Because Plaintiff presents new evidence with its Reply, the Court GRANTS Defendants' Motion for Leave and deems the proposed surreply submitted with Defendants' Motion filed as of the date of this Order.

other accessories.  (Bray Decl. ¶ 3, Mar. 23, 2007 (Pl.'s App. in Supp. of Application ("Pl.'s App.") at 1).)  Equibrand did not initially participate in the saddle and tack industry, but eventually sought to expand its business into the saddle and tack arena.  (*Id*.)  In September of 1997, Equibrand began discussions with Defendant Dale Martin to purchase Martin's custom saddle manufacturing business, Dale Martin Saddlery.  (*Id*.)

Dale Martin is a former professional roper whose "life experiences have uniquely prepared [him] to be a highly skilled designer of saddles and tack."  (Dale Martin Decl. ¶ 23 (Defs.' App. at 12).)  Prior to the negotiations with Equibrand in 1997, Martin was the sole proprietor of Dale Martin Saddlery and engaged in the business of "selling manufacturing, marketing and distributing saddles."  (Pl.'s Ex. A-1 at 1 (Pl.'s App. at 21).)  At that time, Dale Martin Saddlery was in its infancy, with no national brand presence and "virtually no marketing." (Bray Decl. ¶¶ 4-5, Mar. 23, 2007 (Pl.'s App. at 2); Defs.' Br. at 2.)  According to Plaintiff, Equibrand was interested in purchasing Dale Martin Saddlery to grow and expand the business. (Bray Decl. ¶ 5, Mar. 23, 2007 (Pl.'s App. at 2).)

In January of 1998, Equibrand and Martin entered into an Asset Purchase Agreement (the "Agreement").  (*See generally* Pl.'s Ex. A-1 ("Agreement") (Pl.'s App. at 19-139).) Significantly, the Agreement states that after the purchase, Equibrand intended to operate Dale Martin Saddlery under that name, and that Martin agreed "not to operate any business with a similar name which could reasonably be expected to confuse the public."  (Agreement § 5.6 (Pl.'s App. at 43).)  Additionally, the Agreement allowed Martin to continue to operate another business entitled Martin's Saddlery and Western Wear, where he allegedly sold his own saddles

labeled "Martin Saddlery."  (Dale Martin Decl. ¶ 4 (Defs.' App. at 8); Agreement § 5.6 (Pl.'s

App. at 43).)

On or about November 22, 1999, Equibrand filed an application to register the trademark

"Dale Martin Saddlery" with the United States Patent and Trademark Office, Registration No.

2,647,797.  (*See* Pl.'s App. at 322.)  In conjunction with the trademark registration, Martin signed

a "Consent to Registration" that stated: "I, Dale Martin, hereby consent to the use and

registration by Equibrand Corporation of my name as a trademark, as part of the trademark,

DALE MARTIN SADDLERY, for equestrian related goods, namely tack, bridles and saddles."

(*Id*. at 323.)

Additionally, at the time Martin sold Dale Martin Saddlery to Equibrand, Martin became

Vice-President of Equibrand.  (Dale Martin Decl. ¶ 5 (Defs.' App. at 9).)  According to Martin,

by 2001 his relationship with Equibrand had soured and his employment was terminated.  (*Id*. ¶ 7

(Defs.' App. at 9).)  Martin claims that, despite Equibrand's averment that it has always used and

intends to use the "Dale Martin" name in relation to its products, after his employment was

terminated, Equibrand informed Martin that it planned to dissociate itself from Martin and

remove all reference to "Dale Martin" from its products.  (*Id*. ¶ 8 (Defs.' App. at 9).)  On July 16,

2001, Equibrand filed the trademark "Martin Saddlery" with the United States Patent and

Trademark Office, Registration No. 2,569,990.  (Pl.'s App. at 324.)  According to Defendants,

Equibrand liquidated, gave away, or destroyed all products that bore the name "Dale Martin."

(Thomas Decl. ¶¶ 3-4 (Defs.' App. at 1-2).)  Defendants contend that Equibrand has not used the

"Dale Martin Saddlery" mark since the events in 2001.  (Thomas Decl. ¶¶ 3-4; Phifer Decl. ¶¶ 2-

5 (Defs.' App. at 1-4).)

Equibrand counters that, over the course of nine years since the purchase of Dale Martin

Saddlery, Equibrand has worked to build the business and create a national presence in the

custom saddle market. (Bray Decl. ¶ 7, Mar. 23, 2007 (Pl.'s App. at 2).) Equibrand maintains

that, by offering custom-made equestrian products to wholesalers, who then offer the custom-

made product to the end consumer, it created an incredibly successful business using the Dale

Martin name. (*Id*. ¶ 8 (Pl.'s App. at 3).) As a result of Equibrand's efforts, the terms "Dale

Martin," "Dale Martin Saddlery," "Martin Saddlery," and "Martin" have purportedly become

synonymous with the name Equibrand and deeply branded with the consumer as a "brand that is

trusted for both quality and performance." (*Id*. ¶ 12 (Pl.'s App. at 4).) Equibrand also avers that,

at all times since 1998, it has used and continues to use the names "Dale Martin," "Dale Martin

Saddlery," "Martin Saddlery," and /or "Martin" to endorse and promote its products. (*Id*. ¶ 13

(Pl.'s App. at 4); *see also* Pl.'s Ex. A-2, A-3, A-4 (Pl.'s App. at 140-49).)

Martin maintains that he never surrendered the use of his name with regard to

endorsement of equestrian products and, what is more, he has, for several years, continued to use

his name on his own equestrian products with Equibrand's knowledge; however, prior to the

instant action, Equibrand has not complained of Martin's use of his name in the endorsement of

equestrian products. (Dale Martin Decl. ¶¶ 9-14 (Defs.' App. at 9-10).) Specifically, in 2003,

Martin moved to Oklahoma and, for approximately six months, produced saddles and tack

stamped "Martin's Saddlery" and "Dale Martin." (*Id*. ¶ 9 (Defs.' App. at 9); Defs.' Ex. D-1

(Defs.' App. at 13-14).) He then moved to Salado, Texas and began "Wildfire Saddlery,"

through which he promoted saddles as "by Dale Martin," "Dale Martin," and "made by Dale Martin." (Dale Martin Decl. ¶ 9 (Defs.' App. at 9); Defs.' Ex. D-2 (Defs.' App. at 15-16).) Martin additionally authorized the use of his name on saddles promoted by Crossfire Saddlery during 2005 and 2006. (Dale Martin Decl. ¶ 11 (Defs.' App. at 10); Defs.' Ex. D-3 (Defs.' App. at 17-18).) According to Martin, Equibrand was fully aware of the use of his name in marketing such products and Kenneth Bray, Equibrand's CEO, even visited Wildfire Saddlery and Crossfire Saddlery and saw the products marked with the Dale Martin name; however, Equibrand never objected to such use. (Dale Martin Decl. ¶¶ 10-12 (Defs.' App. at 9-10).)

In 2006, Martin moved to Cleveland, Tennessee and went to work for Reinsman Equestrian Products, Inc. ("Reinsman") as the Vice President of Sales and Marketing. (*Id.* ¶ 15-16 (Defs.' App. at 10).) In his new position, Martin was responsible for designing saddles and tack. (*Id.* ¶ 15 (Defs.' App. at 10).) Equibrand states that, in 2007, it became aware that Reinsman had hired Martin and they were developing a line of saddles and tack called the "Dale Martin Collection." (Bray Decl. ¶ 17, Mar. 23, 2007 (Defs.' App. at 5).) In January of 2007, Bray saw a sampling of Defendants' products. (*Id.*; Pl.'s Ex. A-6 (Pl.'s App. at 293-98).) Additionally, Defendants placed an ad to run in the March 2007 issue of *The Trail Rider Magazine*, which advertised the "Dale Martin Collection" and stated "Imitations are everywhere . . . Take a closer look at Reinsman." (Bray Decl. ¶ 18 (Pl.'s App. at 5); Pl.'s Ex. A-7 (Pl.'s App. at 299-300).) Defendants also placed a similar ad in the March 2007 issue of *Western World Magazine*. (Brandon Decl. ¶ 5 (Defs.' App. at 5).) Defendants maintain that, at the time they arranged for this advertising, Reinsman was not aware of any claim that Martin was not allowed

to use his name in connection with any other equestrian products.  (*Id.*)

Equibrand claims that, with the arrival of Defendants' Dale Martin products on the market, complaints, questions and confusion regarding the origin of Defendants' products have begun to arise among Equibrand's customers; specifically, wholesale customers have inquired as to whether Reinsman has taken over Martin Saddlery, if they should now contact Reinsman to order Martin products, if Defendants' "Dale Martin Collection" is the same as Equibrand's Martin products, and how the wholesale distributors should explain the different products bearing the same or similar name to end consumers.  (Bray Decl. ¶ 19, Mar. 23, 2007 (Pl.'s App. at 5-6).)  On February 6, 2007, Equibrand sent Defendants a cease and desist letter, demanding that Defendants immediately discontinue all use of the Dale Martin mark and name.  (Bray Decl. ¶ 21 (Pl.'s App. at 6); Pl.'s Ex. A-8 (Pl.'s App. at 301-03).)  Equibrand's counsel then allegedly contacted Reinsman's counsel and the parties attempted to resolve the issues in the letter.  (Pl.'s Br. at 5.)  Despite these attempts to reconcile, Defendants filed a petition to cancel Equibrand's "Dale Martin Saddlery" mark on March 19, 2007, "which solidified Equibrand's need to seek immediate injunctive relief."  (*Id.*)

Equibrand contends that Defendants' actions constitute trademark infringement under both Texas law and the Lanham Act, unfair competition, and a breach of the Agreement.  (Pl.'s Br. at 6.)  Equibrand now seeks a preliminary injunction forbidding Defendants to use the Dale Martin name or any derivation thereof in conjunction with the sale or offer for sale of any saddle, bridles, tack, or other equestrian related products.  (Pl.'s Application for TRO and Prelim. Inj. ¶ 13.)  Defendants state that, during the resolution of this dispute, Reinsman intends to

continuing providing saddles and tack exclusively under the "Reinsman" trademark with additional descriptive phrases such as "Designed by Dale Martin," "By Dale Martin," and "Made by Dale Martin." (Brandon Decl. ¶ 7 (Defs.' App. at 6).) Reinsman agrees not to further advertise using the phrase "Dale Martin Collection" until after resolution of this dispute. (*Id*. ¶ 6 (Defs.' App. at 5-6).)

## II.    Preliminary Injunction

To obtain a preliminary injunction, the moving party must demonstrate to the Court that: (1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the threatened injury to the defendant; and (4) granting of the preliminary injunction serves the public interest. *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). If the moving party cannot prove all four of these elements, a court must deny the injunctive relief since "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

### A.    Likelihood of Success on the Merits: Lanham Act

The Lanham Act states:

(1)    Any person who shall, without the consent of the registrant--

    (a)    use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .

shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1)(a) (2007).  To prevail under the Lanham Act, a plaintiff must first show that

the word or phrase in dispute is registerable or protectable.  *Zatarains, Inc. v. Oak Grove*

*Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983); *March Madness Athletic Ass'n v. Netfire,*

*Inc.*, 310 F. Supp. 2d 786, 806 (N.D. Tex. 2003).  After protectability is established, the plaintiff

must prove that a likelihood of confusion exists between the marks at issue.  *March Madness*

*Athletic Ass'n*, 310 F. Supp. 2d at 806 (citing *Soc'y of Fin. Exam'rs v. Nat'l Ass'n of Certified*

*Fraud Exam'rs, Inc.*, 41 F.3d 223, 224 (5th Cir. 1995)).

### i.   Protectability of Equibrand's Registered Trademarks

"A mark is protectable if it '*either* (1) is inherently distinctive *or* (2) has acquired

distinctiveness through secondary meaning.'"  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763,

769 (1992) (emphasis in original).  Additionally,

> [a]ny registration issued . . . and owned by a party . . . shall be prima facie evidence
> of the validity of the registered mark and of the registration of the mark, of the
> registrant's ownership of the mark, and of the registrant's exclusive right to use the
> registered mark in commerce on or in connection with the goods or services specified
> in the registration subject to any conditions or limitations stated therein.

15 U.S.C. § 1115(a).  Under this premise, courts have held that "federal registration of a mark,

including a surname, creates a presumption that the mark is distinctive."  *Avery Dennison Corp.*

*v. Sumpton*, 189 F.3d 868, 876 (9th Cir.1999); *see also Lois Sportswear, U.S.A., Inc. v. Levi*

*Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) (because registered trademarks are presumed

distinctive, they should be afforded the utmost protection); *E. & J. Gallo Winery v. Spider Webs*

*Ltd.*, 129 F. Supp. 2d 1033, 1038 (S.D. Tex.2001) (registered marks are presumed distinctive).

Therefore, if a plaintiff can show that a mark is validly registered, it is presumed distinctive and therefore protectable.

It is undisputed that Plaintiff registered trademarks for both "Dale Martin Saddlery" and "Martin Saddlery." (*See* Pl.'s App. at 322-24.) Thus, both marks are presumed to be valid and distinctive and are entitled to protection under federal trademark law, which satisfies Plaintiff's burden for the first element of this claim. Plaintiff argues that, even absent the presumption of validity a registered trademark receives, the marks "Dale Martin Saddlery" and "Martin Saddlery" are among a family of marks that have acquired a secondary meaning that affords them protection under the law.

A trademark has successfully acquired a secondary meaning when "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Two Pesos, Inc.*, 505 U.S. at 766 n.4 (internal citations omitted). A family of marks may gain such a secondary meaning. "A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991). To gain protection, the common characteristic in the family of marks must be indicative in the mind of the consumer of the origin of the goods. *Chauvin Int'l, Ltd. v. Goldwitz*, 927 F. Supp. 40, 48 (D. Conn. 1996) (citing *J & J Snack Foods Corp.*, 932 F.2d at 1462). Such protection extends to any mark containing the family name that evokes such a reaction in the consumer, even if that particular mark or combination of words is

not used by the owner.  *Id.*

Furthermore, it is well established that survey evidence is the preferred and most persuasive manner in which to establish secondary meaning.  *March Madness Athletic Ass'n, L.L.C.*, 310 F. Supp. 2d at 809 (citing *Sugar Busters, L.L.C. v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999); *Zatarains, Inc.*, 698 F.2d at 795).  However, other factors, taken together, may also establish that a mark has achieved a secondary meaning; these factors include:

> (1) the length and manner of use of the mark by the plaintiff; (2) the nature and extent of advertising and promotion of the mark; (3) efforts made to promote a conscious connection, in the consumer's mind, between the mark and a particular product or service; and (4) the defendant's intent in copying the mark.

*Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1539 (S.D. Tex. 1996) (internal citation omitted), *aff'd*, 155 F.3d 526 (5th Cir. 1998).

Although Equibrand now primarily operates under the name "Martin Saddlery," Equibrand states that, since the Agreement in 1998, it has used the names "Dale Martin," "Dale Martin Saddlery," "Martin Saddlery" and/or "Martin" to promote its line of Martin products.  (Bray Decl. ¶¶ 13-14, Mar. 23, 2007 (Pl.'s App. at 4).)  In fact, the Martin name, or some variation thereof, is included on Plaintiff's products, mailing labels, and website.  (*Id.* ¶ 14 (Pl.'s App. at 4); Pl.'s Exs. A-2, A-3, A-4 (Defs.' App. at 140-48).)  Although, as Defendants point out, Plaintiff does not present evidence of when and in what manner Plaintiff used each form of the Dale Martin name in relation to its products, Defendants do not rebut that Plaintiff has, in fact, used some variation of the Dale Martin name in connection with its equestrian products since 1998.  Thus, it appears that Equibrand has used some form of the Dale Martin name on their

products and in association with their business since 1998, a factor that weighs in favor of finding secondary meaning and is also indicative of a family of names protectable under trademark law.

Additionally, with respect to the second and third factors, Equibrand has provided a detailed explanation of its expenditures on advertising and promotion of its products connected to the Dale Martin name, which amount to over $2.7 million.  (*See* Pinder Decl. ¶¶ 3-5, Apr. 5, 2007, Ex. B-1, B-2 (Pl.'s App. in Supp. of Reply at 4-8).)  Specifically, Equibrand advertises Martin products in six national publications and on RFD TV.  (Bray Decl. ¶ 10, Mar. 23, 2007 (Pl.'s App. at 3).)  Last year, Equibrand sold Martin products to over 1300 stores, its total sales surpassing $7.5 million.  (*Id.* ¶ 11.)  Equibrand maintains that its efforts since 1998 were part of a deliberate plan to grow the Martin product line and create a connection between the Martin name and Equibrand's products in the minds of consumers, which has evidently succeeded due to the alleged confusion caused between Equibrand's products and Reinsman's new "Dale Martin Collection."  (Bray Decl. ¶ 16, 19, Mar. 27, 2007 (Pl.'s App. at 5-6).)  Considering that the parties agree that Equibrand purchased Dale Martin Saddlery as a start-up company with "virtually no marketing," the effort and money Equibrand has expended advertising and promoting the Martin line in an effort to associate Equibrand products with the Dale Martin name also weighs in favor of finding a secondary meaning.

Finally, when observing evidence of Defendants' intent, the Court finds Reinsman's advertisement of the "Dale Martin Collection," which states: "Imitations are everywhere . . . Take a closer look at Reinsman" coupled with Defendants' insistence on using the Dale Martin

name on their products is at least some evidence of Defendants' intent to reap the benefit of the

Dale Martin name, which is undoubtedly more recognizable and profitable after Equibrand's

nationwide promotion efforts than it was in 1998 when used in connection with a small, local

business. If Reinsman's intent was truly only to recruit Dale Martin to design products based on

his unique life experience, an activity which is not prohibited or contested by Plaintiff, it would

be content with employing Dale Martin as a designer and not be disputing whether or not it can

include the "Dale Martin" name on its products.

Defendants argue that Dale Martin's use of his name in connection with his own products

since 2003 militates against a finding of secondary meaning. However, Dale Martin apparently

marketed such products in the retail market through isolated retails stores where Equibrand did

not compete.[3]  (Pl.'s Reply at 6.)  Dale Martin's use of the Martin name on his own products, in

what appears to a different market and on a smaller scale, is not enough to outweigh the factors

discussed above that lean in favor of finding that Equibrand's use of the Martin name in the

wholesale market of equestrian related products has given the Martin marks a secondary meaning

among consumers in that market. Although Plaintiff has not provided survey evidence

demonstrating a connection between Equibrand and the Martin name, Defendants have not

rebutted all other factors that clearly lean in favor of finding that Equibrand's family of marks,

the common factor being the Martin name, are indicative of Equibrand as such products' source

and therefore have acquired a secondary meaning.

---

[3] To boot, as discussed in more detail below, there is some question as to what rights Dale Martin retained
under the Agreement in using his name or a variation thereof; it is clear, however, that Reinsman was not afforded
any rights in the Dale Martin name as it had no part in the Agreement.

In sum, the Court finds Plaintiff's "Dale Martin Saddlery" and "Martin Saddlery" marks protectable both as registered trademarks and as part of a family of marks that have acquired a secondary meaning.  Even assuming these findings, Defendants attempt to show that the marks are not protectable by arguing that: (1) Equibrand abandoned the "Dale Martin Saddlery" mark after it allegedly fired Dale Martin in 2001; and (2) Dale Martin did not give Equibrand the required consent to register the "Martin Saddlery" trademark.

### a.      Abandonment

"A mark shall be deemed to be 'abandoned' . . . when its use has been discontinued with intent not to resume such use.  Intent not to resume may be inferred from circumstances.  Nonuse for 3 consecutive years shall be prima facie evidence of abandonment."  15 U.S.C. § 1127; *see also Exxon Corp. v. Humble Exploration Co.,* 695 F.2d 96, 99 (5th Cir. 1983).  "Use" is defined as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127.  Abandonment requires complete discontinuance of use of the trademark; that is, even minor or sporadic uses of a mark will defeat the defense of abandonment.  *Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 938 (9th Cir. 2006) ("Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith.") (internal citation omitted); *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006) (finding no abandonment although trademark owner had not used the mark personally because another company had used the mark with the owner's permission); *Cumulus Media, Inc. v. Clear Channel Communs., Inc.*, 304 F.3d 1167, 1173-74 (11th Cir. 2002) ("evidence of [the owner's] use of [the mark] . . . was limited, consisting largely

of a logo on a billboard, some business cards, and a few promotional materials, but it was sufficient to enable the trial court to reject [the defendant's] abandonment defense").  To boot, the party claiming abandonment has the burden of proof.  *Exxon Corp.*, 695 F.2d at 99 (internal citations omitted).

Defendants maintain that Equibrand has not used the "Dale Martin Saddlery" mark since 2001, which constitutes prima facie evidence of abandonment.  Defendants support this contention with Martin's sworn declaration in which he states that, after his termination in 2001, Equibrand informed him that it intended to remove all references to "Dale Martin" from its product line.  (Dale Martin Decl. ¶ 8 (Defs.' App. at 9).)  Additionally, Martin alleges that the pictures of products bearing the "Dale Martin Saddlery" mark provided by Equibrand in this action are of products offered by Equibrand before 2001.  (*Id.* ¶ 19 (Defs.' App. at 11).)  Further, no products or shipping labels Dale Martin received from Equibrand since 2001 have contained the "Dale Martin Saddlery" mark.  (*Id.* ¶ 20-21.)  Finally, Defendants provide a sworn declaration of Scott Thomas, the previous saddle production manager of Equibrand from approximately 1999 to 2003, in which he states that, in 2001, he and other employees were instructed to remove all stamps from products that included the mark "Dale Martin."  (Thomas Decl. ¶¶ 2-3 (Defs.' App. at 1).)  According to Thomas, inventory bearing the words "Dale" or "Dale Martin" was discontinued from advertising and was either liquidated, given to employees, or destroyed, and *all use* of the mark "Dale Martin" was discontinued.  (*Id.* ¶ 4 (Defs.' App. at 1-2).)  Defendants offer this evidence to prove that Plaintiff had no intent to resume use of the "Dale Martin Saddlery" mark, and thus it has been abandoned by Plaintiff and is not entitled to protection.

Plaintiffs provide contradictory evidence that, from 1998 until the present, Equibrand has used and continues to use the "Dale Martin Saddlery" mark; specifically, Equibrand has, at all times since 1998, sold products bearing this mark.  (Bray Decl. ¶ 3, Apr. 5, 2007 (Pl.'s App. in Supp. of Reply at 1); Joe Martin Decl. ¶¶ 5, 7 (Pl.'s App. in Supp. of Reply at 9-10); Irick Decl. ¶ 3 (Pl.'s App. in Supp. of Reply at 12).)  Plaintiffs also provide pictures of products and address labels bearing the Dale Martin Saddlery mark that are currently sold and used by Equibrand. (Pl.'s Ex. A-2 (Pl.'s App. at 140-46); Pl.'s Ex. A-4 (Pl.'s App. at 148); Bray Decl. ¶¶ 5-6, Apr. 5, 2007 (Pl.'s App. in Supp. of Reply at 1-2).)  Equibrand's General Manager avers, under oath, that:

> [I]n 2001, Equibrand began stamping its products with the 'Martin Saddlery' name instead of using the full name 'Dale Martin Saddlery.'  However, at no time in 2001, or thereafter, did Equibrand abandon the use of the Dale Martin name, nor did it destroy, liquidate or give away products that bore the name Dale Martin Saddlery.  Rather, Equibrand continued to use and ship products to customers that bore the Dale Martin Saddlery name . . . .

(Joe Martin Decl. ¶¶ 4-5 (Pl.'s App. in Supp. of Reply at 9-10).)  In effect, the parties have presented conflicting evidence through the use of directly contradictory affidavits that creates a factual dispute as to whether Equibrand had some use of "Dale Martin" or "Dale Martin Saddlery" in commerce after 2001.  The Court cannot resolve this factual dispute from the briefing alone.  However, even if Plaintiff did not specifically use the "Dale Martin Saddlery" mark on its products or in relation to its equestrian business after 2001, because the mark "Dale Martin Saddlery" has acquired a secondary meaning as part of a family of marks using the Martin name,  it is still afforded protection under trademark law; accordingly, the Court will not negate the element of protectability based on Defendants' defense of abandonment.

b.        **Lack of Consent**

Defendants next argue that the "Martin Saddlery" mark is not protectable because Dale

Martin did not give Equibrand his consent to register such a mark.  Section 2(c) of the Lanham

Act does not allow registration of a trademark that "[c]onsists of or comprises a name . . .

identifying a particular living individual except by his written consent . . . ."  25 U.S.C. §

1052(c).  Similar to Defendants' argument of abandonment, because the Court has found "Martin

Saddlery" protectable among a family of marks that have acquired a secondary meaning, its

protectability is not dependent on a valid trademark registration; therefore, the Court will not find

that this particular mark is not protectable for lack of consent.  Plaintiffs contend, however, that

even if Dale Martin's consent was required for the trademark to be valid and the mark

protectable, Martin granted such consent to Equibrand by implication.  The Court agrees.

The Trademark Trial and Appeal Board evaluated a factually similar situation in *In re*

*Kaplan*, 225 U.S.P.Q. (BNA) 342 (TTAB 1985).  In *Kaplan*, Don Kaplan sold his interest in the

business D.B. Kaplan Delicatessen, Inc. to the party seeking to register the name Don Kaplan as

a trademark.  *Id*.  The agreement between the parties provided that "the trade name and service

mark 'D. B. Kaplan Delicatessen' and any name or mark confusingly similar thereto is the

property of D.B. Kaplan Delicatessen, Inc. . . . and that Donald Kaplan cannot use it in any

subsequent business."  *Id*.  The Trademark and Appeal Board held that a reasonable reading of

the agreement implied the requisite consent to register a mark including Don Kaplan's name.

The Board reasoned, in part, that the purpose of Section 2(c) is to protect individuals from the

commercial exploitation of their own name, and here, Kaplan clearly relinquished his right to use

his name or any confusingly similar name in any future business and also indicated that the mark "D.B. Kaplan Delicatessen" was the property of the purchasing party.

Similarly, as discussed in more detail below, it appears from the evidence currently before the Court that Dale Martin sold all rights and interest he owned in Dale Martin Saddlery, including any registered and common law trademarks and intellectual property associated with the business, to Equibrand and agreed not to operate a business with such name or any confusingly similar name. Additionally, Dale Martin signed a written consent letter to allow Equibrand to register the trademark "Dale Martin Saddlery." Dale Martin voluntarily gave Equibrand the right to use his name as a trademark, giving Equibrand the right to prevent all others from using such mark. Dale Martin was fully aware of such use and therefore does not need protection from the commercial exploitation of his name by another. Defendants argue that, because the registration of the initial trademark was not technically registered at the time of the "Martin Saddlery" application, the written consent for the first trademark cannot serve as written consent for the second trademark. Although the Patent and Trademark Office may require a complete application in order to grant registration of a trademark, including a separate valid written consent for a second trademark if the first trademark's application is pending at the time of the second application, *see, e.g., In re McKee Baking Co,* 218 U.S.P.Q. 287, 288 (TTAB 1983), the Court sees no reason to make such a distinction in this context. After all, both trademarks were eventually registered, and Dale Martin clearly gave written consent for the initial registration of his name as a trademark and was compensated for his business and the use of the Dale Martin name via the Agreement. When considering the purpose for obtaining such

consent, it appears the written consent to register "Dale Martin Saddlery" implies consent to also register "Martin Saddlery." For the foregoing reasons, the Court finds that, even if Dale Martin's consent was required to register the mark "Martin Saddlery," it was properly obtained. Thus, the Court will not find that the "Martin Saddlery" mark is not protectable on the basis that Dale Martin did not consent to its registration.

In sum, because both trademarks were validly registered and Plaintiff's have given sufficient evidence that such marks have most likely acquired a secondary meaning, the Court finds that Equibrand has shown that the trademarks are protectable, and therefore has shown a likelihood of success on the merits with respect to the first element of its claims under the Lanham Act.

### ii.    Likelihood of Confusion

The "touchstone" of a trademark infringement inquiry is whether or not a defendant's use creates confusion as to the "source, affiliation, or sponsorship" of the defendant's goods because of its purported likeness to the plaintiff's goods. *Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526, 543 (5th Cir. 1998). The Fifth Circuit has enumerated the following list of non-exhaustive factors, no single one being dispositive, to determine whether a likelihood of confusion exists: "(1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion." *Id.* (citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1122 n.9 (5th Cir. 1991), *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.* 505 U.S. 763 (1992); *Conan*

*Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 149 (5th Cir.1985).)

The first element, the type of mark infringed, focuses on the strength of the mark. "The strength of a service mark for the purposes of analyzing likelihood of confusion is dependent upon both the placement of the mark on the spectrum of distinctiveness, from arbitrary to generic,[4] and the extent to which consumers in the relevant marketplace recognize the mark as an indicator of source." *Pebble Beach Co.*, 942 F. Supp. at 1542; (citing *Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan Assoc.*, 651 F.2d 311, 315-16 (5th Cir. 1981)); *see also Elvis Presley Enters., Inc. v. Capece*, 950 F. Supp. 783, 791 (S.D. Tex. 1996), *rev'd*, 141 F.3d 188, 201 (5th Cir. 1998).

"Martin" is a surname and generally regarded by the Fifth Circuit as a "descriptive" mark, which is distinctive only if it has acquired a secondary meaning. *Conan Props., Inc.*, 752 F.2d at 155. The Court has previously found that Equibrand's marks have acquired a secondary meaning, which indicates that consumers identify the mark with the source of the goods. As discussed in detail above, Equibrand has provided evidence of the effort it has put forth to create

---

[4] "To determine whether a mark is protectable, a court must assign the mark into one of five categories, which, arranged in order of increasing distinctiveness, are: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *March Madness Athletic Ass'n*, 310 F. Supp. 2d at 807 (citing *Two Pesos, Inc.*, 505 U.S. at 768); *see also Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 461 (5th Cir. 2003). A generic mark describes an entire class of products (such as "computer") and is not protected under trademark law. *Sport Supply Group, Inc.*, 335 F.3d at 461 (internal citations omitted). A "descriptive" mark, however, describes certain features or characteristics of a product, but is not "inherently distinctive." *Id.* (internal citations omitted). "A 'suggestive mark' 'merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods.'" *Id.* (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999)). Arbitrary marks apply an unfamiliar word in an uncommon way, and a fanciful mark is not a real word, but is invented only for its use as a mark. *Lane Capital Mgmt., Inc.*, 192 F.3d at 344. Suggestive, arbitrary, and fanciful marks are deemed "inherently distinctive" and are, thus, entitled to protection under trademark law. *Sport Supply Group, Inc.*, 335 F.3d at 461 (citing *Two Pesos, Inc.*, 505 U.S. at 768).

a connection in the minds of consumers of the Martin name and Equibrand products.

Additionally, Equibrand has registered both "Dale Martin Saddlery" and "Martin Saddlery" which afford them a presumption of distinctiveness.  Accordingly, the disputed marks are considered strong under the applicable law, which leans in favor of finding a likelihood of confusion.

The second element, the similarity of the marks, is determined by "comparing the marks' appearance, sound, and meaning."  *Elvis Presley Enters., Inc.*, 141 F.3d at 201 (internal citation omitted).  "The relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated."  *Id.* (internal quotation and citations omitted).  When making this determination, it is appropriate to consider the context in which the trademark is used, such as on labels, packaging, and advertising.  *Id.*  (internal citations omitted).  Additionally, when evaluating the third element, "the greater the similarity between products and services, the greater the likelihood of confusion."  *Id.* at 202.  It is undisputed that both Plaintiff and Defendants sell custom-made high-quality saddles and tack; this factor alone weighs in favor of finding a likelihood of confusion.  Additionally, Reinsman and Equibrand are both stamping their products with some form of the name "Dale Martin" or "Martin."  Reinsman has recently advertised using the phrases "Designed by Dale Martin" and the "Dale Martin Collection."  Although not identical, all of these phrases carry the Martin name as the dominant feature.  Although Reinsman claims that its products are clearly labeled with the Reinsman mark in addition to the Dale Martin name, the Court fails to see how such an addition clearly sets apart Reinsman's

products from Equibrand's products.  *See id.* at 202 (citing 3 J. Thomas McCarthy, McCarthy on

Trademarks and Unfair Competition § 23:44 (4th ed. 1997) (noting that it is proper for a Court to

give greater effect to the dominant feature of a mark in the comparison)).  Thus, the Court finds

that both the parties' products and marks are similar, which weigh heavily in favor of finding a

likelihood of confusion.

Defendants also assert that confusion at the point of sale is unlikely for consumers because

Equibrand markets primarily to its authorized wholesale dealers.  Defendants also point out that

Equibrand has failed to provide evidence that Equibrand and Reinsman advertise through the

same media outlets or target the same purchasers.  Although no specific evidence is presented,

Equibrand states affirmatively that both Equibrand and Reinsman advertise in the same media

outlets and target the same wholesale dealers and distributors.  (Bray Decl. ¶ 20, Mar. 23, 2007

(Pl.'s App. at 6).)  Defendants do not rebut or deny this assertion, but merely point to

Equibrand's lack of specifics.  More persuasive than this is the evidence of actual confusion

Reinsman's use of the Dale Martin name has caused among dealers Equibrand markets to.  Bray,

Equibrand's CEO, has stated that, since Reinsman began selling and advertising products

stamped with the "Dale Martin" name,

> Equibrand's wholesale customers [have] contacted Equibrand, asking if Reinsman
> took over Martin Saddlery; if the dealers now need to contact Reinsman to order
> Martin Products; if Defendants' products bearing the Dale Martin name were the
> same as Equibrand's products; and how they were supposed to explain the distinction
> to the end consumer, who thinks they are the same line of products since they both
> bear the Martin name.

(Bray Decl. ¶ 19, Mar. 23, 2007 (Pl.'s App. at 5-6).)  Again, Defendants do not rebut these

statements, but argue that because Dale Martin has been using similar marks bearing his name since 2003 with no actual confusion, Plaintiff's cannot meet their burden on this element. However, as noted above, Reinsman appears to be marketing the same products to the same customers as Equibrand, which Dale Martin was not doing when he was using his name on his own products in the retail market.  Thus, the potential for actual confusion that Plaintiff's assert may not have arisen until Dale Martin joined with Reinsman.  The Court cannot accept Defendants' argument of "concurrent use" when the use by Dale Martin alone appears to be of a different nature than the use by Dale Martin in conjunction with Reinsman.  Therefore, without some affirmative evidence from Defendants rebutting Plaintiff's assertion, the Court finds that Plaintiff's have presented evidence of actual confusion among consumers, which is highly probative of a likelihood of confusion.

Defendants also state that the care consumers in the equestrian market exercise when purchasing products weighs in favor of finding that there is no likelihood of confusion.  Even if this were true, which is questionable considering the allegations of actual confusion Plaintiff has asserted, the Court finds that this does not outweigh the host of reasons discussed above that lean in favor of a finding of likelihood of confusion.  For the foregoing reasons, the Court finds that Plaintiff's have also established probable success on the element of likelihood of confusion with respect to its claims under the Lanham Act.

### iii.    Fair Use

Defendants next assert that the use of the Dale Martin name in association with Reinsman's products designed by Dale Martin is a fair use of the term.  Under the Lanham Act, a

party can assert the defense of "fair use," which means that the term is not used as a trademark, but rather is descriptive and used "in good faith only to describe the goods or services of such party." 15 U.S.C. § 1115(b)(4). "The 'fair-use' defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185 (5th Cir. 1980).

With respect to a surname, even when it acquires a secondary meaning and becomes a trademark, the surname generally "continues to serve the important function to its bearer of acting as a symbol of that individual's personality, reputation and accomplishments as distinguished from that of the business, corporation or otherwise, with which he has been associated." *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986) (internal citation omitted). Accordingly, "though an individual may sell the right to use his personal name . . . a court will not bar him from using that name unless his intention to convey an *exclusive* right to the use of [his] own name is clearly shown." *Id*. at 822-23 (internal quotations and citations omitted) (emphasis added). Whether or not such exclusive right was granted depends on the terms of the sale. *Id*. at 823. Significantly, "the fact that an alleged infringer has previously sold his business with its goodwill to the plaintiff makes a sweeping injunction more tolerable." *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735 (2d Cir. 1978).

Defendants assert that describing the Reinsman products as "Designed by Dale Martin" is the "only way for Mr. Martin to reap the benefits of the value of this name he built up outside his short tenure at Reinsman." (Defs.' Resp. at 17.) Defendants further argue that Dale Martin's life

experience, not Equibrand's promotion and marketing, have given him a well-known name in the industry, a name which he never intended to surrender the rights to.  However, if Dale Martin did in fact sell the exclusive right to use his name in relation to equestrian products to Equibrand, attempting to now use his name with respect to products sold by Reinsman is not a "fair use" of the Dale Martin name, even if it is an accurate description of the products.  Exactly what rights Dale Martin retained in his name, if any, and whether or not he intended Equibrand to own the exclusive right to use the name Dale Martin in a trademark or trade name are dependent upon the terms of the Agreement.

The Agreement is governed by Texas law.  (Agreement § 6.7 (Pl.'s App. at 47).)  Under Texas law, a contract is ambiguous if its meaning is uncertain and doubtful, or it is reasonably susceptible to more than one interpretation.  *Coker v. Coker,* 650 S.W.2d 391, 393-94 (Tex. 1983).  "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id*. at 394.  "'Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract.'"  *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co. v. S. Plains Switching, Ltd. Co.*, 174 S.W.3d 348, 358 (Tex. App.–Fort Worth 2005, no pet.)).

The Agreement states that Equibrand purchased "all right, title and interest in and to all of the assets, business, goodwill and rights of [Dale Martin] used in and/or produced by [Dale Martin Saddlery] . . . ."  (Agreement § 1.1 (Pl.'s App. at 21).)  The assets purchased in relation to Dale Martin Saddlery included "all Intellectual Property (including, without limitation, the

trademarks, patents and copyrights listed on <u>Schedule 3.11(a)</u>), [and] the goodwill associated therewith . . . ."  (Agreement § 1.1(d) (Pl.'s App. at 22); *see also* Bill of Sale § 1(d) (Pl.'s App. at 93).)  Section 3.11 of the Agreement states that "<u>Schedule 3.11(a)</u> identifies (i) all Intellectual Property used in connection with the Business . . . ."  (Agreement § 3.11(a) (Pl.'s App. at 34).)  However, Schedule 3.11(a) of the Agreement defines the Intellectual Property of Dale Martin Saddlery, without qualification, as "None."  (Agreement Schedule 3.11(a) (Pl.'s App. at 76).)  Section 3.11(b), in further specifying the Intellectual Property Dale Martin owned at the time of the Agreement, reads as follows:

> Except as set forth on <u>Schedule 3.11(b)</u> . . . [Dale Martin] owns, has the right to use, sell, license and dispose of, and has the right to bring actions for the infringement of, and, where necessary, has made timely and proper application for, all Intellectual Property rights . . . necessary or required for the conduct of [Dale Martin Saddlery] as currently conducted and as proposed to be conducted . . . .

(Agreement § 3.11(b)(ii) (Pl.'s App. at 34).)  Likewise, Schedule 3.11(b) defines all Intellectual Property excepted from Dale Martin's ownership at that time as "None."  (Agreement Schedule 3.11(b) (Pl.'s App. at 76).)  "Intellectual Property" is later defined in the Agreement to include "all registered and unregistered trademarks, service marks, trade dress, logos, trade names, and corporate names, including all goodwill associated therewith . . . ."  (Agreement Ex. A (Pl.'a App at 54).)  Finally, the Agreement includes a separate "Assignment of Intellectual Property" in which Dale Martin assigned to Equibrand:

> all of his worldwide right, title and interest in and to all federally registered (if any) and common law trademarks, servicemarks and tradenames owned by [Dale Martin] in connection with the Business [Dale Martin Saddlery] (collectively, the <u>Trademark Rights</u>), together with all of the goodwill of [Dale Martin Saddlery] associated with the use of and symbolized by the Trademark Rights.

(Assignment of Intellectual Property ¶ 1 (Pl.'s App. at 101).)

The parties dispute over whether or not the Agreement transferred to Equibrand the exclusive right to use the Dale Martin name. The Agreement, in more than one section, transfers all intellectual property then associated with Dale Martin Saddlery, including goodwill, trademarks, and trade names, both registered and common law, to Equibrand; the Agreement then defines the Intellectual Property of Dale Martin Saddlery at the time of the transfer as "None." However, the Agreement also states that Dale Martin owned all goodwill, trademarks, and trade names associated with Dale Martin Saddlery, which would include any trade names, trademarks, and goodwill built up over the year the business was operating prior to the time Equibrand purchased it. Thus, although the Agreement defines the intellectual property of Dale Martin Saddlery as "None," it appears some intellectual property was transferred, or the other relevant sections and the separate assignment would be meaningless.

Exactly what rights were transferred is unclear from the four corners of the document; however, the Court need not finally resolve this ambiguity to make a preliminary determination. Even though the schedule indicates that the intellectual property of the Business at that time of sale was "None," this is the only provision that implies that Dale Martin owned no intellectual property associated with the Business at the time of sale.[5] On the other hand, the provisions

---

[5] The Court notes that Section 5.6 allows Dale Martin to continue operating the business "Martin Saddlery & Western Wear" and forbids Dale Martin to use any other confusingly similar business name. (Agreement § 5.6 (Pl.'s App. at 43).) This provision says nothing about any intellectual property associated with that business or the use of any business name, trade name, or trademark by any party other than Dale Martin. Thus, this provision is unhelpful with respect to what intellectual property rights, if any, Dale Martin owned or retained in connection with Dale Martin Saddlery.

noted above in the Agreement, the Bill of Sale, and the Assignment of Intellectual Property, read together with the entire contract indicate that Dale Martin both owned intellectual property in Dale Martin Saddlery, including any goodwill associated with that business via the Dale Martin name, and intended to transfer to Equibrand all intellectual property associated with Dale Martin Saddlery; this would implicitly include the exclusive right to use "Dale Martin Saddlery" as a trade name of a business or as a trademark on a product.  Further, it is undisputed that Dale Martin received valuable consideration of $800,000 in exchange for Dale Martin Saddlery, a small saddle manufacturing business in its infancy.  (Agreement §2.1 (Pl.'s App. at 26-27).); *cf.* *Madrigal*, 799 F.2d at 825 (noting that the defendant's business was purchased for a "token amount," which indicated that the plaintiff had not sold the exclusive right to use his name); *see also Guth v. Guth Chocolate Co.,* 224 F. 932, 934 (4th Cir. 1915) (finding that a defendant who sold the use of his surname for the purpose of manufacturing candy and then started selling candy with packaging displaying his full name was attempting to "keep for himself the essential thing he sold, and also keep the price he got for it.").  Finally, Dale Martin consented to the use of his name in the registered "Dale Martin Saddlery" trademark, which, by definition, prevents all others except for the owner of the trademark from using the mark "Dale Martin Saddlery."  Dale Martin's statement in his affidavit that he never intended to give up the right to use his own name to market or endorse equestrian products coupled with the notation in Agreement that Dale Martin Saddlery had no intellectual property at the time of the sale cannot overcome the numerous other provisions of the Agreement and other factors that indicate the opposite–that Dale Martin sold all intellectual property, including trademarks, associated with Dale Martin

Saddlery to Equibrand, which impliedly includes the "Dale Martin" name.  If Dale Martin sold the exclusive right to use his name for valuable consideration, he cannot claim that any subsequent use of his name not provided for by the Agreement[6] is fair, even under the guise of an accurate description of the product.  Accordingly, although an ambiguity exists in the Agreement as to what rights Dale Martin retained, if any, with respect to the use of his name in relation to equestrian products, the evidence indicates that Defendants will not likely be able to succeed on a fair use defense.  Thus, Defendants' fair use argument will not successfully rebut Plaintiff's showing of a likelihood of success on the merits.  Because Plaintiff has made a successful showing of a likelihood of success on the merits with respect to its Lanham Act claims, the Court now turns to whether or not Plaintiff has made a sufficient showing of irreparable injury.

## B.      Irreparable Injury

In a trademark case, a plaintiff may show irreparable injury by establishing a substantial likelihood of confusion.  *Ramada Franchise Sys. v. Jacobcart, Inc.*, No. 3:01-CV-0306-D, 2001 U.S. Dist. LEXIS 6650, at *8 (N.D. Tex. May 17, 2001) (citing  *KFC Corp. v. Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989)); *see also Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F. Supp. 1387, 1394 (S.D. Tex. 1989) ("When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods constitutes immediate and irreparable harm,

---

[6] The Court notes that the Agreement did allow Dale Martin to continue operating Martin Saddlery & Western Wear and that Dale Martin did, in fact, use his name personally on products in the retail market with Plaintiff's knowledge.  However, any personal use Dale Martin retained in his name or any acquiescence of Plaintiff in Dale Martin's use of his own name in his individual capacity does not negate or diminish any exclusive transfer of intellectual property under the Agreement.  After all, the Agreement does not clearly grant Dale Martin the right to join with a third party such as Reinsman and use his name, but rather indicates that such use of the Dale Martin name belongs to Equibrand, with a possible limited use retained for Dale Martin in his individual capacity.  (*See* Agreement § 5.6 (Pl.'s App. at 43).)

regardless of the actual quality of the defendant's goods. The injury lies in the fact that the plaintiff no longer can control its own reputation and goodwill.")

As discussed above, the Court has found that Plaintiff has established a likelihood of confusion, evidenced by the alleged actual confusion between Plaintiff's and Defendants' products bearing the Dale Martin name.  As a result, Plaintiff has lost control over the quality of the goods produced bearing such name and has also potentially lost customers and goodwill associated with its company.  Such a loss is difficult to quantify; thus, Plaintiff has met its burden of establishing irreparable harm.  Defendants argue that, because Equibrand allowed Dale Martin to use the Dale Martin name on his own products since 2003, such delay rebuts any presumption of irreparable harm.  *See Amicus Commc'ns, L.P. v. Hewlett-Packard Co. Inc.*, 1999 WL 495921, at *18 (W.D. Tex. Jun. 11, 1999) (unpub.).  As discussed above, Dale Martin's prior use appears to be on a smaller scale in a different market than Reinsman's current use of the Dale Martin name.  Equibrand is seeking to enjoin use by Reinsman and Dale Martin acting in his capacity as an employee of Reinsman, not use by Dale Martin personally.  With respect to these Defendants, use of the Dale Martin name on Reinsman's products began in early 2007, which resulted in communications between the parties and the filing of this motion in late March.  It appears that Plaintiff did not delay with respect to the particular offensive conduct by Reinsman.  This distinguishes the instant facts from the cases finding that delay warranted denial of an injunction when the plaintiff delayed in taking action against one party's continuous course of conduct.  *See, e.g. Gonannies, Inc. v. Goaupair.com, Inc.*, 464 F. Supp. 2d 603, 606-09 (N.D. Tex. 2006); *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*, No. 3:05-CV-0094-D, 2006 U.S. Dist. LEXIS

36590, at *13-14 (N.D. Tex. June 6, 2006); *Amicus Commc'ns, L.P. v. Hewlett-Packard Co. Inc.*,

1999 WL 495921, at *18-19 (W.D. Tex. Jun. 11, 1999);    Accordingly, the Court will not find a

lack of irreparable harm based on delay; rather, Plaintiff has met its burden with respect to this

element.

### C.    Balancing of Hardships

The balancing of hardships also appears to lean in Plaintiff's favor.  Plaintiff's have

previously established that, if Defendants are able to continue allegedly infringing on its

trademarks, Plaintiff will suffer harm to its goodwill and sales that is difficult, if not impossible,

to quantify.  Defendants argue that Reinsman has invested time and money into recruiting and

designing products with Dale Martin, and an injunction requiring Reinsman to pull such products

from the market will result in a loss of revenue and goodwill.  However, the fact that Defendants

will suffer lost profits from not being able to market likely infringing products is not a factor that

tips the scales in favor of Defendants.  *See Lakedreams v. Taylor*, 932 F.2d 1103, 1110 n.12 (5th

Cir. 1991) (noting the First Circuit's holding that "[w]here the only hardship that the defendant

will suffer is lost profits from an activity which has been shown likely to be infringing, such an

argument in defense 'merits little equitable consideration.'"  *Concrete Machinery Co. v. Classic

Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988)).  Additionally, Defendants state that

granting an injunction would "wholly deprive Mr. Martin of his property right of publicity" and

also "the key to his ability to earn a living."  (Defs.' Br. at 23-24.)  However, an injunction would

not prevent Dale Martin from continuing to design saddles and tack for Reinsman.  Furthermore,

as noted above, Plaintiff is not seeking to enjoin Dale Martin personally.  An injunction will only

prevent the inclusion of the Dale Martin name on Reinsman's products, an activity that has been found to likely be infringing.  Reinsman repeatedly states it recruited Dale Martin to design products because of his unique position to do so based on his life experience; an injunction will not prevent such goals from coming to fruition.  Thus, Defendants have not shown hardships that outweigh the likelihood of confusion and irreparable injury presented by Plaintiff.

### D.     Public Interest

The Fifth Circuit has held that, "the public has an interest in preventing confusion about the origin of the products that it buys." *Lakedreams*, 932 F.2d at 1110; *see also Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999) ("The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks.")  Thus, the public interest will be served through an injunction by decreasing the risk for confusion as to the origin of Reinsman's products and also by enforcing federal and state infringement laws.  Defendants again assert that Dale Martin's right to publicity in his own name will be harmed, which disserves the greater public policy supporting one's right to publicity.  As noted above, the Court is not enjoining Dale Martin from designing equestrian relating products and holding such products out as his own. Instead, the Court is enjoining use of his name on Reinsman products in a manner violative of trademarks and trade names he consented to and was, in fact, paid consideration for.  Therefore, the Court rejects this argument and finds that the public interest will be served by granting an injunction.

**IV.     Conclusion**

Because the Court finds Plaintiff has met its burden on each of the four required elements warranting a preliminary injunction, the Court GRANTS Plaintiff's Application for Temporary Restraining Order and Preliminary Injunctive Relief.  As of the date of this Order, Defendants Reinsman and Dale Martin, in his capacity as the Vice President of Reinsman, shall immediately cease any and all use of the name and / or logo "Designed by Dale Martin," the "Dale Martin Collection," the name "Dale Martin" or any derivation thereof in conjunction with the sale or offer for sale of any saddle, bridles, tack, or other equestrian related products.

**IT IS SO ORDERED.**

Signed this 17th day of May 2007.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE